William A. Rossbach
ROSSBACH LAW, P.C.
401 North Washington Street
P. O. Box 8988, Hellgate Station
Missoula, MT 59807-8988
Telephone: (406) 543-5156
Telefax:     (406) 728-8878
bill@rossbachlaw.com

   *Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
### MISSOULA DIVISION

| | |
|---|---|
| MONICA CONRAD  PAOLI, individually and on behalf of others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>VOLKSWAGEN GROUP OF AMERICA, INC.,<br>Defendant. | Civil Action No.  _____<br><br>**<u>CLASS ACTION COMPLAINT</u>**<br><br>**FOR INJUNCTIVE RELIEF, EQUITABLE RELIEF, AND DAMAGES**<br><br>**JURY TRIAL DEMANDED** |

1

## NATURE OF CLAIM

Plaintiff Monica Paoli ("Plaintiff"), individually and on behalf of all other members of the below-defined statewide class she seeks to represent, for her Class Action Complaint (the "Complaint") alleges against Volkswagen Group of America, Inc. ("Volkswagen") upon personal knowledge as to her own acts and as to all other matters upon information and belief, based upon the investigation made by the undersigned attorneys, as follows:

1.      Plaintiff brings this consumer class action for herself and on behalf of all persons similarly situated who purchased or leased certain vehicles with diesel engines manufactured, distributed, and/or sold by defendant Volkswagen and/or its related subsidiaries, successors, or affiliates with a built-in emission Defeat Device (defined below) system that conceals the vehicles' actual emission of nitrogen oxide (NOx).

2.      The Defeat Device in the Class Vehicles is an algorithm that controls all or certain emission controls. Based on this program, the Class Vehicles utilize their full emissions control system solely when the cars' computer system detects the performance of emissions testing on the vehicle. The Defeat Device thus allows the vehicles to detect when the car is being tested for emissions controls but otherwise disable full emissions controls under normal driving conditions, causing

the vehicles to emit far more NOx than advertised—in fact, up to 40 times the federal standard. Nitrogen oxide contributes to ozone, smog and increases the risks of human health effects from the vehicles' emissions.

3.    As used in this complaint, "Class Vehicles" refers to the Volkswagen vehicles owned by citizens and residents of Montana equipped at the time of sale with software designed to conceal emissions of NOx in excess of emissions standards established by the Clean Air Act ("Defeat Device"), sharing a common, uniform, and defective design, including, but not limited to, the following makes and model years:

- 2009-2015 Jetta

- 2009-2014 Jetta Sportwagen

- 2012-2015 Beetle

- 2012-2015 Beetle Convertible

- 2010-2015 Audi A3

- 2010-2015 Golf

- 2015 Golf Sportwagen

- 2012-2015 Passat

4.    All citizens or residents of the State of Montana who have purchased or leased a Class Vehicle equipped with the Defeat Device are herein referred to

as Class Members ("Class Members").

5.     On September 18, 2015, at the direction of the U.S. Environmental Protection Agency (EPA), Volkswagen recalled eight vehicle models it manufactures with Turbo Diesel Ignition ("TDI®") Clean Diesel engines.

6.     The recall arises from Volkswagen's brazen inclusion and deliberate concealment of the Defeat Device and a long series of fraudulent representations and other deceits to consumers and the purchasers of these vehicles.

7.     Volkswagen willfully misrepresented, through a national marketing campaign, the environmental benefits of its TDI® Clean Diesel engines in an effort to promote their vehicles. Volkswagen specifically misrepresented to the purchasers of these vehicles that its Clean Diesel technology substantially reduced NOx emissions and, as a result, created less smog. Symbolic of these representations, Volkswagen released a television commercial showing an elderly woman holding a white scarf to the exhaust pipe, keeping it there and then lifting up the still pristine white scarf to demonstrate the environmental benefits of its new diesel engines. Relying on these and many other representations, Plaintiff and other Class Members purchased Volkswagen's diesel cars, paying an added cost, in order to take advantage of the vehicles' decreased environmental impact.

8.     Volkswagen's purported environmental benefits from its diesel

engines were a fabrication. As sold to Class Members, the Class Vehicles could not meet federal during normal operations. To conceal this fact, Volkswagen installed an algorithm within the vehicles' system, the Defeat Device, which permits the cars to pass emissions testing.

9.    In April 2015, Volkswagen deceived Class Members yet another time. Although under federal investigation at the time and fully aware of the Defeat Device within the Class Vehicles, Volkswagen sent a letter to Class Members reiterating the Company's ongoing commitment to the environment and advising vehicle owners of a system improvement that Volkswagen would perform, free of charge, in order to optimize their vehicles' efficient operation. This carefully crafted service notice letter did not inform Class Members that their vehicles were equipped with the Defeat Device and, thus, not in compliance with relevant federal emission standards, and it failed to inform Class Members that, without responding to the service notice, their vehicles could not pass emission standards. Once again, Volkswagen knowingly hid the Class Vehicles' utilization of a Defeat Device from Class Members, and continued to promote Volkswagen as a company compliant with and dedicated to environmental issues.

10.    An estimated five hundred thousand vehicles were sold in the United States equipped with the Defeat Device.

11.    Volkswagen has represented that it sold 11 million diesel engine vehicles worldwide that contain the Defeat Device.

12.    The Defeat Device is not an automotive component that reasonable consumers expect to be installed on their vehicles.

13.    All Class Members were injured from the time they purchased their vehicles. The Defeat Device precludes all Class Members from operating their vehicles in compliance with the Clean Air Act. However, no Class Members knew, or could reasonably have discovered, the Defeat Device prior to the recall because it is designed to conceal the device when the vehicle undergoes emission testing.

14.    Upon information and belief, prior to the sale of the Class Vehicles, Volkswagen knew of the Defeat Device but did not disclose it to the Environmental Protection Agency, state agencies charged with mobile source compliance under the Clean Air Act, and/or consumers. A reasonable manufacturer would not have sold a vehicle with a Defeat Device.

15.    Reasonable consumers who knew about the Defeat Device would not have purchased the Class Vehicles due to their unlawful emission of NOx.

16.    As a result of Volkswagen's alleged misconduct, Plaintiff and Class Members were harmed and suffered actual damages, in that the Class Vehicles are

unfit for their ordinary and intended use and cannot be operated in compliance with CAA emission standards. Plaintiff and the Class did not receive the benefit of their bargain as purchasers and lessees, received vehicles that were of a lesser standard, grade, and quality than represented, and did not receive vehicles that met ordinary and reasonable consumer expectations.

17.     As a result, all purchasers of the Class Vehicles overpaid for their cars at the time of purchase. Furthermore, the recent disclosure about the Defeat Device has further caused the value of the Class Vehicles to diminish materially. Without the benefit of superior fuel efficiency, which on information and belief will be substantially reduced without the Defeat Device, the continued use of Class Vehicles will require Class Members to purchase clean diesel, at a substantially higher price than conventional gasoline, without the attendant fuel efficiency benefits touted by Volkswagen of diesel fuel. Accordingly, purchasers or lessees of the Class Vehicles paid more, either through a higher purchase price or higher lease payments, than they would have had Volkswagen disclosed the Defeat Device and will continue to have to incur additional sums of money by operating their vehicles.

18.     Further, and in spite of Volkswagen's belated recall of the Class Vehicles, litigation is necessary in order to ensure that Class Members receive full

and fair compensation, under the auspices of court order, for their injuries.

## PARTIES

### *Plaintiff*

**19.**   Plaintiff Monica Paoli is a citizen of the state of Montana. She resides in Missoula Montana. Ms. Paoli owns a 2011 Volkswagen Jetta TDI®. She purchased it in 2011. Ms. Paoli's Volkswagen Jetta was manufactured, sold, distributed, advertised, marketed, and warranted by Volkswagen. Ms. Paoli purchased this vehicle for personal, family, and household use. She uses this vehicle every day and for long distance weekend and longer trips. Ms. Paoli specifically purchased the Volkswagen Jetta because Volkswagen advertised it as a fuel efficient vehicle, and because Volkswagen advertised it as having low emissions.

### *Defendant*

20.   Defendant Volkswagen Group of America, Inc. ("Volkswagen") is a New Jersey corporation with principal place of business at 2200 Ferdinand Porsche Dr., Herndon, Virginia 20171. Volkswagen does business in every U.S. state and the District of Columbia. At all times relevant to this action, Volkswagen manufactured, distributed, sold, leased, and warranted the Class

Vehicles at issue under the Jetta, Beetle, Audi, Golf, and Passat brand names throughout the United States. Volkswagen and/or its agents designed the Clean Diesel engines and engine controls systems in the Class Vehicles, including the Defeat Device.   Volkswagen also developed and disseminated the owners' manuals and warranty booklets, advertisements and other promotional materials relating to the Class Vehicles.

## JURISDICTION AND VENUE

21.    Jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which members of the Class (as defined below) are citizens of states different from Defendant. In addition, under 28 U.S.C. § 1367, this Court may exercise supplemental jurisdiction over the state law claims because all of the claims are derived from a common nucleus of operative facts and are such that Plaintiff would ordinarily expect to try them in one judicial proceeding.

22.    Venue lies within this judicial district under 28 U.S.C. § 1391 because Volkswagen conducts substantial business in this this District, has caused harm to Class Members residing in this District, and Plaintiff Paoli resides and owns and operates her vehicle in this District such that a substantial part of the

events and omissions giving rise to the claims asserted in this Complaint occurred within this District.

## FACTUAL ALLEGATIONS

23.    Volkswagen's utilization of a Defeat Device permitted the Class Vehicles to circumvent federal and state emissions requirements. As a result, the vehicles do not comply with emission requirements arising from the Clean Air Act during regular road operation.

24.    Volkswagen deliberately promoted the Class Vehicles as utilizing a "clean" diesel engine in order to pass off the cars as environmentally friendly and charged purchasers thousands of dollars more for the addition of the 2.0 litre TDI$^{®}$ Clean Diesel engine.

25.    Class Members relied on Volkswagen's representations about the TDI® engines' low emissions in making the decision to buy vehicles equipped with those engines.

26.    Class Members had no knowledge of the Defeat Device prior to the EPA's disclosure of its presence on September 18, 2015.

## Background on the Clean Air Act

27.    Congress enacted the Clean Air Act (CAA) to establish a comprehensive federal law that regulates air emissions from stationary and mobile

sources.

28.     When President George H. W. Bush signed the Clean Air Act Amendments of 1990 (CAAA), EPA Director William K. Reilly noted that the "benefits of the bill are enormous. Acid rain emissions will be cut almost in half; 30 million tons of toxic chemicals will be prevented from fouling the air every year; and all areas of the country will finally have the means to attain air quality standards on a realistic schedule. As a result, air toxics risk will be slashed by three-quarters and health problems will be reduced significantly, including cancer risk, respiratory disease, heart ailments and reproductive disorders."

29.     In conjunction with the CAAA, the EPA finalized rules in February 2007, to reduce hazardous air pollutants from mobile sources.

30.     The EPA estimated that the Control of Hazardous Air Pollutants from Mobile Source Rules, *see* 40 CFR Parts 59, 80, 85 and 86; 72 Fed Reg. 8428-8570 (Feb. 26, 2007), would reduce total emissions of mobile source air toxics by 330,000 tons and VOC emissions by over 1 million tons by 2030.

31.     The EPA has also initiated a national clean diesel campaign to reduce diesel emissions.

32.     All of these efforts necessitate compliance with the federal laws and programs.

33.   To help insure compliance, 42 U.S.C. § 7522(a)(3)(B) prohibits "any person to manufacture or sell, or offer to sell, or install, any part or component intended for use with, or as part of, any motor vehicle or motor vehicle engine, where a principal effect of the part or component is to bypass, defeat, or render inoperative any device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with regulations under this subchapter, and where the person knows or should know that such part or component is being offered for sale or installed for such use or put to such use."

34.   Similarly, federal regulations prohibit equipping a passenger vehicle with a Defeat Device. *See* 40 CFR § 86.1809-12. This regulation was promulgated to provide the EPA with authority to enjoin the automobile and truck industry from past use of Defeat Devices to circumvent emission requirements.

35.   In 1998, the EPA announced a record penalty against seven truck manufacturers, including Caterpillar and Volvo Truck Corp., arising from the inclusion of a computer device in heavy duty diesel engines. That device allowed the engine to pass EPA emission standards, but would switch off emission controls during highway driving. Under the resulting settlement, the seven companies agreed to spend more than one billion dollars to resolve federal claims.

36.   That same year, the EPA and Department of Justice settled charges

12

against American Honda Motor Co. for $267 million and Ford Motor Company for $7.8 million for selling vehicles with a device that defeated emission control devices.

## **Volkswagen's Actions**

37.     In a bid to expand into North American markets, Volkswagen announced its new generation of redesigned Volkswagen Jetta vehicles at the 2005 Los Angeles Auto Show. This was only the second time Volkswagen debuted a product in the United States. The Jetta was available with either a standard gasoline engine or with a TDI$^{®}$ diesel engine.

38.     The TDI$^{®}$-equipped Jetta fell into the least restrictive bin for motor vehicles as established by the EPA under the Clean Air Act. When it was introduced, the Jetta Mark 5 was available in all but five States. These five States followed California's strict LEV emissions standards; standards that were more stringent than the federal emission standards at the time.

39.     At the end of 2006, the EPA removed the two least restrictive bins for passenger cars. With this change in standard, Volkswagen's TDI$^{®}$ diesel engines no longer met federal standards and Volkswagen was forced to remove the Jetta TDI$^{®}$ from all U.S. markets for over an entire year.

40.     On January 4, 2007, in response to the new regulations, Volkswagen

announced "the cleanest ever TDI$^{®}$ engine" in a press release. This brand new "2.0 liter Common Rail diesel engine" utilized a "nitrogen oxide reservoir catalytic converter" to remove pollutants from the exhaust.

41.    "The central theme of the entire concept," according to Volkswagen, was "the reduction of nitrogen oxide." Volkswagen claimed that its new system would reduce nitrogen oxide emissions by "up to 90%." Further, Volkswagen boasted that their new technology was able to meet the stringent Tier II/Bin 5 EPA emissions standards without the use of urea injection, the standard method of NOx emission reduction. But Volkswagen had not in fact resolved the excessive emissions in its TDI$^{®}$ models.   In a November 2007 letter to dealerships, Volkswagen delayed the release date of the 2009 2.0 TDI$^{®}$ Clean Diesel Jetta by six months, from April 2008 to August 2008.[1]

42.    Volkswagen attributed the delay to "a technical issue" with the new technology. Volkswagen assured its dealerships that the "first priority is to ensure that the integrity and quality of the new technology is not compromised."

43.    Following the reintroduction of the TDI$^{®}$-equipped Jetta in August

---

[1] Volkswagen,    Volkswagen unveiled the cleanest ever TDI engine, Jan 4, 2007. Available at https://www.volkswagen-media-services.com/en/detailpage/-/detail/Volkswagen-unveiled-the-cleanest-ever-TDI-engine/view/93238/7a3c3d3e53277ddfb9a63b244e18a6ce?p_p_auth=9jHcUFKo.

2008, Volkswagen rapidly added the TDI® Clean Diesel system to several more of Volkswagen's models.  The VW Golf and Audi A3, for example, were added for the model 2010 year.

44.     Upon their release, and based upon representations by Volkswagen about the TDI® vehicles' stringent emission controls, various environmental groups hailed these diesel- powered vehicles for their perceived, reduced environmental impact.

45.     The Green Car Journal named the 2009 Jetta TDI® and the 2010 Audi A3 TDI® as the recipients of the Green Car of the Year Award in 2009 and 2010, respectively.

46.     Volkswagen claims that environmental sustainability is "at the core of [its] operating philosophy." Further, it states a goal of "becoming the world's most environmentally sustainable automaker by 2018."[2]


//


//

_____
[2] *See* Volkswagen Group America Homepage, http://www.volkswagengroupamerica.com/environment.html (last visited Sept. 22, 2015).

47.     Low emissions from the TDI® Clean Diesel engines are at the cornerstone of Volkswagen's environmental marketing campaign. Stating "[t]his ain't your daddy's diesel," Volkswagen has represented to the public through its advertising and marketing material that the "old diesel realities no longer apply." Instead of producing cars that are "stinky, smoky and sluggish" the TDI® Clean Diesel technology has "ushered in a new era of diesel."[3]

48.     On its website, Volkswagen cites a 96 percent reduction in NOx emissions since 1990. It continues that "with Clean Diesel technology . . . we'll generate a lot less smog in the air."[4]

49.     Volkswagen also maintains that its Clean Diesel technology makes its vehicles, on average, 18 percent more fuel efficient than corresponding gasoline models.

50.     Audi's webpage titled "Clean Diesel Technology," claims that its systems reduce Nitrogen Oxide Emissions by 95 percent when compared to gasoline.[5]

---

[3] *See* www.vw.com/features/clean-diesel (last visited Sept. 21, 2015). This page is no longer available as of September 22, 2015.

[4] *See* www.clearlybetterdiesel.org (last visited Sept. 22, 2015).

[5] See www.audiusa.com/technology/efficiency/tdi (last visited Sept. 22, 2015).

51.     Running on diesel, the owner of the vehicle also incurs an additional cost per gallon of fuel, which is sometimes substantial, reflecting the difference in the price per gallon between gasoline and diesel.

52.     Volkswagen, however, marketed the car to emphasize fuel economy and its reduced impact on the environment. But environmentally-conscious vehicle purchasers were willing to absorb the additional costs to reap the environmental benefits.

## **Discovery of Fraud**

53.     The EPA announced on Friday, September 18, 2015, that Volkswagen intentionally skirted clean air laws in at least five model vehicles over a seven year period.

54.     The models and model years implicated in the announcement are 2009-2015 Jetta, 2009-2014 Jetta Sportwagen, 2012-2015 Beetle, 2012-2015 Beetle Convertible, 2010-2015 Audi A3, 2010-2015 Golf, 2015 Golf Sportwagen, and 2012-2015 Passat vehicles.

55.     The EPA stated that Volkswagen used a piece of software as a Defeat Device that resulted in the Class Vehicles emitting fewer smog-causing pollutants only during an emission test.

56.     Volkswagen developed, manufactured and installed an algorithm in

17

the electronic control module (ECM) of the Class Vehicles that is able to detect when a service station or other entity conducts an emission inspection on the vehicle.

57.   The algorithm triggers the use of emission controls during the inspection. Upon information and belief, at all other times, the Class Vehicles operate without the engagement of some or all of the emission controls.

58.   The algorithm makes this determination based on various inputs, including the position of the steering wheel, vehicle speed, the duration of the vehicle's engine's operation and barometric pressure, according to the EPA.

59.   During emission testing, the Class Vehicles' ECM run software which produces compliant emission results under an ECM calibration.

60.   When Class Vehicles are in use, however, their emissions of NOx actually increase by a factor of 10 to 40 times above EPA compliance levels, depending on driving circumstances (*e.g.,* highway or city driving).

61.   Volkswagen CEO Martin Winterkorn essentially admitted Volkswagen's actions in a statement released on September 20, 2015: "I personally am deeply sorry that we have broken the trust of our customers and the public."

62.   Herr Winterkorn also announced that Volkswagen would conduct an

18

internal investigation.

63.    On September 21, 2015, the chief executive of Volkswagen's U.S. operations, Michael Horn, stated: "Let's be clear about this: Our company was dishonest with the EPA and the California Air Resources Board and with all of you." He continued, "In my German words, we have totally screwed up."[6]

64.    Volkswagen withdrew its ads for its diesel cars following the EPA's announcement and, upon information and belief, directed its dealers to stop selling 2015 diesel cars with 2.0-liter engines.

## **Previous Fraudulent Notice**

65.    Volkswagen not only defrauded Class Members at the time of purchase, but it also defrauded Class Members again the spring of 2015 in connection with the Defeat Device.

66.    In or around April 2015, Volkswagen sent a letter to Class Vehicle owners offering a free update of the ECM software in the vehicle.

//

//

_____

[6] *See* VW Emissions cheating affects 11 million cars worldwide, Washington Post, Sept. 22, 2015. http://www.washingtonpost.com/business/economy/vw-emissions-cheating-affects-11-million-cars-worldwide/2015/09/22/30f59bca-6126-11e5-9757-e49273f05f65_story.html.

67.    Volkswagen opened its letter announcing its "ongoing commitment to the environment" and stating that it was acting "in cooperation with the United States Environmental Protection Agency" in order to "conduct an emissions service action …."

68.    In offering an explanation for the upgrade, Volkswagen asserted that "[u]nder certain operating conditions, the earlier strategy may have increased the chance of the vehicles MIL light illuminating. If the MIL light illuminates for any reason, your vehicle will not pass an IM emission inspection in some regions."

69.    Coincidently, at this time, Volkswagen released a set of commercials promoting the cleanliness of its diesel fuel engines.

70.    Upon information and belief, Volkswagen was fully aware of the EPA's investigation of the company and the presence of a Defeat Device in its diesel engines at the time that it nationally promoted its vehicles with the TDI® engines.

## Continuing Concerns About the Defeat Device

71.    The subsequent revelation that VW rigged its exhaust system raises a number of additional concerns to Class Members.

72.    Upon information and belief, Volkswagen would not include a

Defeat Device within the Class Vehicles unless it was necessary for the performance of the vehicles. Thus, the TDI® engines, once made to comply with national and state fuel emission standards will not, on information and belief, meet their listed EPA estimated miles per gallon. This will significantly raise fuel costs for Class Members.

73.     Thus, on information and belief, without the Defeat Device, the Clean Diesel 2.0 litre TDI® engine cannot meet emission standards in any state for any sustained period.

## TOLLING OF THE STATUTE OF LIMITATIONS
## Fraudulent Concealment Tolling

74.     Upon information and belief, Volkswagen has known of the Defeat Device in the vehicles since at least 2009, and certainly well before Plaintiff and Class Members purchased the Class Vehicles, and has concealed from or failed to notify Plaintiff, Class Members, and the public of the full and complete nature of the Defeat Device.

75.     Because of the nature of the software that conceals the Defeat Device, and because the Defeat Device specifically operated to conceal the nitrous oxide emissions violations during vehicle emissions tests, it was impossible for Plaintiff, Class Members and the public to know about the

Defect Device.

76.    Volkswagen's knowledge, active concealment, and denial of the facts alleged herein, which behavior is ongoing, tolled any applicable statute of limitations.

## Estoppel

77.    Volkswagen was and is under a continuous duty to disclose to Plaintiff and Class Members the true character, quality, and nature of the vehicles. Volkswagen actively concealed the true character, quality, and nature of the vehicles and knowingly made misrepresentations about the quality, reliability, characteristics, and performance of, and emissions from, the vehicles. Plaintiff and Class Members reasonably relied upon Volkswagen's knowing and affirmative misrepresentations and/or active concealment of these facts. Based on the foregoing, Volkswagen is estopped from relying on any statutes of limitation in defense of this action.

## Discovery Rule

78.    The causes of action alleged herein did not accrue until Plaintiff and Class Members discovered that their vehicles had the Defeat Device.

79.    However, Plaintiff and Class Members had no realistic ability to

discern that the vehicles were defective until—at the earliest—after the existence of the Defeat Device was publicly disclosed.

80. Thus, Plaintiff and Class Members were not reasonably able to discover the Defeat Device until after they had purchased the vehicles, despite their exercise of due diligence, and their causes of action did not accrue until they discovered that the Defeat Device caused their vehicles to suddenly lose power.

## CLASS ACTION ALLEGATIONS

81. Plaintiff bring this lawsuit as a class action on her own behalf and on behalf of all other persons similarly situated as members of the proposed Class pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) and/or (b)(2) and/or c(4). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

82. Plaintiff bring this action on behalf of a statewide class of all persons who purchased or leased a Class Vehicle in the State of Montana:

> All persons who currently or formerly owned or leased a Subject Vehicle equipped with a Defeat Device in the State of Montana. Excluded from the Class are Volkswagen's officers, directors, and employees (the "**Montana Class**").

83.    Excluded from the Class are: (1) Defendants, any entity or division in which Defendants have a controlling interest, and their legal representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned; and (3) governmental entities. Plaintiff reserve the right to amend the Class definition if discovery and further investigation reveal that the Class should be expanded, divided into additional subclasses, or modified in any other way.

## Numerosity and Ascertainability

84.    This statewide class is too numerous for individual joinder of all their members to be practicable; Volkswagen's recall now includes nearly 500,000 vehicles. Although the exact number of Class Members in Montana is uncertain and can only be ascertained through appropriate discovery, the number is great enough such that joinder is impracticable. The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court. Class Members are readily identifiable from information and records in Volkswagen's possession, custody, or control.

## Typicality

85.    The claims of the representative Plaintiff are typical of the claims

of the Class in that the representative Plaintiff, like all Class Members, purchased or leased a Volkswagen Class Vehicle designed, manufactured, and distributed by Defendant. The representative Plaintiff, like all Class Members, has been damaged by Defendant's misconduct in that she has incurred costs relating to the Defeat Device. Furthermore, the factual bases of Defendant's misconduct are common to all Class Members and represent a common thread of misconduct resulting in injury to all Class Members.

## Adequate Representation

86.    Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel with substantial experience in prosecuting consumer class actions, including actions involving defective products generally and defective vehicles particularly.

87.    Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the Class, and have the financial resources to do so. Neither Plaintiff nor her counsel have interests adverse to those of the Class.

## Predominance of Common Issues

88.    There are numerous questions of law and fact common to Plaintiff and Class Members that predominate over any question affecting only individual Class Members, the answers to which will advance resolution

25

of the litigation as to all Class Members. These common legal and factual issues include:

      a.     whether the Class Vehicles suffer from the Defeat Device;

      b.     whether Volkswagen knew about the Defeat Device, and, if yes, how long it has known of the Device;

      c.     whether the presence of the Defeat Device in the Class Vehicles constitutes a material fact reasonable consumers would have considered in deciding whether to purchase a Volkswagen Vehicle;

      d.     whether Volkswagen had a duty to disclose the Defeat Device in the Vehicles to Plaintiff and Class Members;

      e.     whether Volkswagen omitted and failed to disclose material facts about the Vehicles;

      f.     whether Volkswagen's concealment of the Defeat Device in the Class Vehicles induced Plaintiff and Class Members to act to their detriment by purchasing the Vehicles;

      g.     whether Volkswagen again concealed the existence of the Defeat Device when it sent an emissions service action letter to Class Vehicle owners in April 2015;

      h.     whether the Class Vehicles were fit for their ordinary and

intended use, in violation of the implied warranty of merchantability;

i.     whether Plaintiff and Class Members are entitled to a declaratory judgment stating that the Defeat Device in the Class Vehicles is not merchantable;

j.     whether Plaintiff and Class Members are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction;

k.     whether Volkswagen should be declared responsible for notifying all Class Members of the Defeat Device and ensuring that all Volkswagen vehicles with the Defeat Device are recalled and repaired;

l.     what aggregate amounts of damages and penalties are sufficient to punish and deter Defendant and to vindicate statutory and public policy, and how such penalties should most equitably be distributed among Class members; and

m.     whether the Class Vehicles can be made to comply with the EPA standards, and if so whether such modifications can be made to the Class Vehicles without substantially degrading the Class Vehicles' efficiency and performance.

## Superiority

89.     Plaintiff and Class Members have all suffered and will continue to suffer harm and damages as a result of Defendant's unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

90.     Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for Defendant's misconduct. Absent a class action, Class Members will continue to incur damages, and Defendant's misconduct will continue without remedy.

91.     Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication.

92.     Classwide declaratory, equitable, and injunctive relief is appropriate under Rule 23(b)(1) and/or (b)(2) because Defendant has acted on grounds that apply generally to the class, and inconsistent adjudications with

respect to the Defendant's liability would establish incompatible standards and substantially impair or impede the ability of Class Members to protect their interests. Classwide relief assures fair, consistent, and equitable treatment and protection of all Class Members, and uniformity and consistency in Defendant's discharge of their duties to perform corrective action regarding the Defeat Device.

93.     Plaintiff is not aware of any difficulty which will be encountered in the management of this litigation which should preclude its maintenance as a class action.

## CLAIMS ALLEGED

## CLAIM I

## VIOLATION OF MAGNUSON-MOSS
## WARRANTY ACT (15 U.S.C. § 2301, *et seq.*)

94.     Plaintiff hereby incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

95.     Plaintiff brings this Count on behalf of the Montana Class.

96.     This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332 (a)–(d).

97.     Plaintiff is a "consumer" within the meaning of the Magnuson-

Moss Warranty Act, 15 U.S.C. § 2301(3).

98.     Volkswagen is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)–(5).

99.     The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

100.    15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

101.    Volkswagen's express warranties are written warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6). The Class Vehicles' implied warranties are covered under 15 U.S.C. § 2301(7).

102.    Volkswagen breached these warranties as described in more detail above. Without limitation, the Class Vehicles are equipped with a Defeat Device, that is, a sophisticated software algorithm that allows the vehicles to detect when the car is being tested for emissions, drastically reducing emissions during testing only but otherwise circumventing full emissions controls under normal driving conditions. The Class Vehicles all share this feature such that the vehicles fail to operate as represented by Volkswagen and emit far more NOx than represented.

103. Plaintiff and each of the other Montana Class members have had sufficient direct dealings with either Volkswagen or its agents (dealerships and technical support) to establish privity of contract between Volkswagen, on one hand, and Plaintiff and each of the other Montana Class members on the other hand. Nonetheless, privity is not required here because Plaintiff and each of the other Montana Class members are intended third-party beneficiaries of contracts between Volkswagen and its dealers, and specifically, of Volkswagen's implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumers only.

104. Pursuant to 15 U.S.C. § 2310(e), Plaintiff is entitled to bring this class action and is not required to give Volkswagen notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiff pursuant to Rule 23 of the Federal Rules of Civil Procedure.

105. Affording Volkswagen a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here. At the time of sale or lease of each Subject Vehicle, Volkswagen knew, should have known, or was reckless in not knowing of its misrepresentations and omissions

concerning the Class Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the true nature of the Clean Diesel engine system, including the existence and nature of the Defeat Device. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiff and Class Members resort to an informal dispute resolution procedure and/or afford Volkswagen a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

106. Plaintiff and other Montana Class members would suffer economic hardship if they returned their Class Vehicles but did not receive the return of all payments made by them.

107. The amount in controversy of Plaintiff's individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit. Plaintiff, individually and on behalf of the other Montana Class members, seeks all damages permitted by law, including the additional sums paid for the TDI$^{®}$ engines and diminution in value of the Class Vehicles, in an amount to be proven at trial.

## CLAIM II

## FRAUD

108.   Plaintiff realleges and incorporates by reference all above paragraphs as though fully set forth herein.

109.   Volkswagen intentionally concealed the above-described material performance and emissions information and denied Plaintiff and the Montana Class information that was material to their purchasing and leasing decisions.

110.   Volkswagen intentionally misrepresented to Plaintiff and the Montana Class in advertising and in other forms of communication, including standard and uniform material provided with each car, that the Subject Vehicle it was selling were capable of high performance and low emissions under normal driving conditions.

111.   Volkswagen knew these representations were false when made or recklessly disregarded their veracity.

112.   Volkswagen omitted from its advertisements, sales brochures, and other forms of public communication that the vehicles were equipped with a Defeat Device, a software algorithm that allowed the vehicles to detect when the vehicle was undergoing emissions testing and activate full emissions

controls for the duration of testing but otherwise suspend full emissions controls under normal driving conditions. This undisclosed feature caused the vehicles to emit far more NOx than advertised.

113.   The undisclosed information regarding the Class Vehicles' performance and lack of compliance with emissions standards is material information because any reasonable person's leasing, purchasing, or repair decisions would be materially affected by the knowledge of the vehicles' true nature.

114.   Volkswagen had the duty to disclose this feature to the EPA, and by extension and implication to the public. Moreover, Volkswagen had a duty to disclose this information to the public because Volkswagen was in a vastly superior position of knowledge about the nature of the Class Vehicles.

115.   Volkswagen had and has an ongoing duty to disclose and has yet to discharge that duty with a full accounting of the nature of the Clean Diesel engine system, including the Defeat Device in the Class Vehicles.

116.   Plaintiff and the Montana Class members reasonably relied to their detriment upon Volkswagen's material misrepresentations, and omissions of material fact, in making their purchasing and leasing decisions. Plaintiff and the Montana Class were led to believe, by Volkswagen's fraudulent

concealment, that the Class Vehicles were environmentally safe and that their emissions controls systems would function as advertised under normal driving conditions.

117. By way of this fraud, Volkswagen induced purchasers and lessees of Class Vehicles to pay inflated values for the Class Vehicles.

118. As a direct and proximate result of Volkswagen's fraudulent concealment, Plaintiff and the other Montana Class members have been harmed and they seek all damages permitted by law, including diminution in value of the Class Vehicles, in an amount to be determined at trial.

## CLAIM III

## UNJUST ENRICHMENT

119. Plaintiff realleges and incorporates by reference all above paragraphs as though fully set forth herein.

120. This claim is brought on behalf of the Montana Class.

121. Volkswagen has received and retained a benefit from Plaintiff and the Montana Class, resulting in inequity.

122. Volkswagen has benefitted from selling and leasing vehicles whose value was artificially inflated by Volkswagen's concealment of the vehicles' performance and emissions problems for far more than they were

worth, at a profit. Plaintiff and members of the Montana Class have overpaid for these vehicles.

123. Volkswagen has further benefitted by avoiding the costs of a recall and other lawsuits, and has benefitted from its statements about the success of Volkswagen diesel vehicles.

124. Thus, all Montana Class Members have conferred a benefit on Volkswagen.

125. It is inequitable for Volkswagen to retain these benefits.

126. Plaintiff and Montana Class Memebers were not aware of the true facts of Volkswagen-branded diesel vehicles and did not benefit from Volkswagen's conduct.

127. Volkswagen knowingly accepted the benefits of its unjust conduct.

128. As a result of Volkswagen's conduct, the amount of its unjust enrichment should be disgorged, in an amount to be determined at trial.

## CLAIM IV
## DECEIT UNDER MCA 27-1-712

129. The Plaintiff hereby realleges and incorporates by reference, as if fully set forth herein, each and every allegation in the preceding paragraphs of this Complaint.

130. The State of Montana has set forth the requirements for deceit at MCA 27-1-712. By its actions alleged herein Defendant made statements of fact about the condition of the vehicles with the Defeat Device which it knew were not true and for which it had no reasonable basis for believing them to be true.

131. By its actions alleged herein Defendant suppressed the truth about the Defeat Device and knew it was likely to mislead Plaintiff and Class Members.

132. By its deceitful conduct alleged herein, Defendant intended to defraud the public and therefore Plaintiff and every individual in the Montana Class who could not and did not have any means of knowing about the deceit until after Defendant revealed the existence of the Defeat Device.

133. As the direct and proximate result of Defendant's suppression and concealment of the Defeat Device, Plaintiff and the Montana Class have suffered injury and damage as alleged herein and are entitled to pursue reimbursement and other compensation for its injuries and damages against Defendant for deceit.

//


//

## CLAIM V

## PUNITIVE AND EXEMPLARY DAMAGES

134. Plaintiff for herself and on behalf of the class hereby incorporates by reference, as if fully set forth herein, each and every allegation in the preceding paragraphs of this Complaint.

135. The aforesaid deceitful and fraudulent acts of Defendant constituted actual malice and fraud in that it intentionally creating a high probability of injury to the Plaintiff and other class members and it deliberately proceeded to act in conscious or intentional disregard or indifference to the high probability of injury and misrepresented/concealed the existence of the Defeat Device.

136. Pursuant to Montana law therefore Plaintiff and the Montana Class are entitled to exemplary and punitive damages in an amount sufficient so that an example will be made of Defendant to promote truth and honesty and to provide an incentive for Defendant and others so situated.

## <u>REQUEST FOR RELIEF</u>

WHEREFORE Plaintiff prays for judgment as follows:

A.     For an order certifying the proposed class and appointing Plaintiff and her counsel to represent the Montana Class;

B.     For an order awarding Plaintiff and the members of the Montana

class actual, statutory, punitive or any other form of damages and penalties provided by and pursuant to the statutes and common law authority cited above;

C.      For an order awarding Plaintiff and the members of the Montana Class restitution, disgorgement or other equitable relief provided by and pursuant to the statutes and common law authorities cited above, or as the Court deems proper;

D.      For an order requiring Volkswagen to adequately disclose and remedy the Defeat Device in its diesel vehicles and an order enjoining Volkswagen from incorporating a Defeat Device in its vehicles in the future;

E.      For an order awarding Plaintiff and the members of the Montana Class pre-judgment and post-judgment interest;

F.      For an order awarding Plaintiff and the members of the Montana Class reasonable attorney fees and costs of suit, including expert witness fees; and;

G.      For an order awarding such other and further relief as this Court may deem just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

DATED this 28th day of September, 2015.

ROSSBACH LAW, P.C.


By_____/s/ William A. Rossbach_____
         William A. Rossbach

*Attorneys for the Plaintiff*